1
2
3
4
5
6
7
8                **UNITED STATES DISTRICT COURT**
9               **CENTRAL DISTRICT OF CALIFORNIA**
10

| | | |
|---|---|---|
| STEVEN SIMS, | ) | NO. CV 11-5312 SS |
|           Plaintiff, | ) | |
|            | ) | |
|         v. | ) | **MEMORANDUM DECISION AND ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
|           Defendant. | ) | |
| _____ | ) | |

**I.**

**INTRODUCTION**

Steven Sims ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying his application for Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Agency is REVERSED and REMANDED for further proceedings. //

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 29, 2007. (Administrative Record ("AR") 91-93).  The Agency denied benefits on July 2, 2008.  (AR 50-55).  Plaintiff requested a hearing by an administrative law judge ("ALJ") on July 22, 2008.  (AR 59).  The ALJ held a hearing on February 23, 2010, (AR 24-48), and on May 7, 2010, he issued an unfavorable decision.  (AR 9-20).  Plaintiff sought review of the ALJ's decision on July 12, 2010, (AR 7).  The Appeals Counsel denied further review on May 6, 2011.  (AR 1).  Plaintiff commenced the instant action on June 24, 2011.

## III.

### FACTUAL BACKGROUND

**A.   Plaintiff's Medical History**

Plaintiff has sought treatment for several medical problems, including episodes of unconsciousness, (AR 226), dizziness, (AR 146, 181, 207, 209, 221, 226, 233, 345, 391), chest pains, (AR 145, 221), left arm and neck pain, (AR 187, 193, 212, 216, 345), vomiting and nausea, (AR 233, 268, 270, 391, 393, 407), abdominal pain and pancreas problems, (AR 283, 378, 391-94, 394, 408, 410), weight loss (AR 269-70, 378) and anxiety.  (AR 166, 185, 345).  He has received treatment from Kaiser Permanente's Bellflower Medical Center and West L.A. Medical Center, as well as St. Francis Medical Center and Cedars-Sinai Medical Center.  (AR 145, 187, 232, 377).

On August 18, 2006, Plaintiff visited Dr. Ontiveros at West L.A. Medical Center for dizziness and stress following an episode that morning where he "passed out." (AR 226). He said he felt lightheaded, experienced a room-spinning sensation, fell to the ground, hit his back and might have lost consciousness. (Id.). On August 21, 2006, Plaintiff went to the emergency room at Kaiser Permanente's Bellflower Medical Center following a dizzy and fainting episode. (AR 145-46, 148, 181-82).[1] The hospital performed a CT scan of Plaintiff's head and the results were negative, indicating no abnormalities. (AR 181).

On August 23, 2006, Plaintiff was admitted to the same hospital for chest pains. (AR 145). Tests performed at the hospital showed Plaintiff had "frequent PVCs", and an echocardiogram and Holter monitor were recommended by the cardiology department. (AR 160, 183). Plaintiff also complained of "vertigo 'spinning' dizziness with movement of his head." (AR 146). On August 24, 2006, Plaintiff was diagnosed with vertigo and discharged. (AR 150).

On August 31, 2006, Plaintiff returned to Dr. Ontiveros at West L.A. Medical Center for a follow-up appointment, during which he complained of dizziness. (AR 221). In September 2006, Plaintiff saw Dr. Saccone for vertigo dizziness, (AR 207, 209), and was diagnosed with benign paroxysmal positional vertigo ("BPPV"). (AR 207). On October 16, 2006, Plaintiff saw Dr. Tafreshi for pain and tingling in his left hand, wrist, and forearm. (AR 212). Plaintiff had a follow-up

---

[1] The record fails to contain an emergency room ("ER") report from Plaintiff's August 21, 2006 visit. Thus, the Court cites to Plaintiff's subsequent medical records that note the August 21, 2006 visit.

appointment with Dr. Saccone on November 2, 2006, during which he again complained of left arm tingling.  (AR 216).  After this appointment, Plaintiff returned to West L.A. Medical Center several times seeking treatment for his left arm pain and tingling.  (AR 187, 193, 199, 202). In January 2007, Plaintiff was prescribed Prednisone.  (AR 188, 196).

On October 4, 2007, Plaintiff was admitted to St. Francis Medical Center for "persistent bouts of vomiting, weight loss." (AR 268, 270). A CT scan of the abdomen and pelvis rendered a small stone in Plaintiff's gallbladder, a small irregular density in the right middle lobe, and portions of the bowel showed diverticulosis of the colon.  (AR 279-280).  A colonoscopy performed on October 8, 2007 revealed an internal hemmorhoid.  (AR 282).  Plaintiff was subsequently discharged. (AR 274).

On October 16, 2007, Plaintiff returned to St. Francis Medical Center for "persistent and intractable vomiting." (AR 233).  On October 17, 2007, the Department of Imaging Services performed an MRI on Plaintiff's cervical spine.  (AR 258-60, 263-65).  The MRI showed disc herniation, osteoarthritis, and disc desiccation.  (AR 263-64).  A radiograph of Plaintiff's upper gastrointestinal tract and small bowel series revealed a small hiatal hernia.  (AR 259-60).

In a consultation report also completed on October 17, 2007, Dr. Zevallos, the consulting physician, found mild lymphocytosis.  (AR 247). Dr. Zevallos described Plaintiff's symptoms as a "complex clinical picture" and named a number of conditions that could cause Plaintiff's symptoms, including  gatroparesis, a tumor or lesion in the inner ear,

4

hyperthrydiosm, prolapse, of the mitral valve or a psychosematic disorder. (Id.). On October 18, 2007, the consulting physician, Dr. Ayoub, diagnosed Plaintiff with labyrinthitis and sent him for audiologic testing. (AR 237). Plaintiff was subsequently discharged. (AR 250).

On October 30, 2007, Plaintiff was admitted to Cedars-Sinai Medical Center, where his operation report reflected his significant problems with vertigo and "probable mild diffuse chronic pancreatitis."[2] (AR 407-08). On November 20, 2007, Dr. Ulick diagnosed Plaintiff with "chronic pancreatitis, automimmune." (AR 392). Plaintiff had a CT scan of his abdomen on February 15, 2008, and although radiology report stated there was no abnormality of the pancreas identified, (AR 390), a prescription form dated February 13, 2008 from St. Francis Medical Center, the same medical center that treated Plaintiff in 2007, reads, "Pt is permanty [sic] disable [sic] due to autoimmune pancreati [sic]." (AR 283). On February 29, 2008, Dr. Lo performed an endoscopic ultrasound of Plaintiff's pancreas and biliary tracts. (AR 378). He found a "persistent mild-to-moderate chronic pancreatitis change." (Id.).

On April 4, 2008, Plaintiff underwent a neurological evaluation to "elicit and analyze all clinically significant job or work related injury induced neurological symptoms (primarily radicular neck and back pain, shoulder pain, headaches, dizziness, etc.)." (AR 350). The

_____

[2] According to the operation report, chronic pancreatitis could be the cause of Plaintiff's chronic nausea, vomiting, and weight loss. (AR 408).

report listed seven primary diagnoses for Plaintiff: (1) posttraumatic cephalgia, (2) posttraumatic stress disorder, (3) cervical radiculopathy/radiculitis, (4) vertigo, (5) cervical headaches/posterior headaches, (6) probable cervical discopathy and (7) cervical myofascial syndrome. (Id.). The report also listed five additional diagnoses: (1) left shoulder sprain/myofascial syndrome, (2) thoracic myofascial syndrome, (3) lumbo-sacral myofascial syndrome, (4) lumbo-sacral radiculopathy/radiculitis and (5) lumbar discopathy. (AR 353).

Plaintiff had several progress appointments from April 10, 2008 to February 12, 2009. (AR 317-24). The reports from those appointments indicated that he continued to complain of headaches, neck pain, dizziness, and pancreatic problems. (Id.). At his progress appointment on May 8, 2008, Plaintiff still had nausea and vomiting. (AR 323).

**B.   Plaintiff's Application**

Plaintiff received DIB payments since approximately August 23, 2006. (AR 94-99). On November 21, 2007, Plaintiff received a statement notifying him that he had exhausted his DIB. (AR 95). He filed an initial application for DIB to continue payments on October 29, 2007. (AR 91-93). That same day the interviewer who completed the "Disability Report - Field Office  - Form SSA - 3367" recorded, "Clmt looked very thin." (AR 103).

On November 7, 2007, Plaintiff completed the "Disability Report - Adult - Form SSA - 3368." (AR 105-115). He wrote that he cannot lift more than fifty pounds at his job, where he was required to lift

seventy-five pounds at times.  (AR 106).  He also cannot stand for more than four hours and his job required eight hours of standing.  (Id.). Plaintiff wrote that his vertigo has him "dizzy all the time – there are times [he] just faint[s]."  (Id.).  Plaintiff listed twelfth grade as the highest grade of school he had completed.  (AR 112).  Plaintiff indicated that "[he] can not [sic] hold down food or liquids and [has] lost weight."  (AR 113).

On November 19, 2007, Plaintiff completed the pain questionnaire, (AR 116-18), on which he listed basketball, football, dancing, and sex as activities he can no longer do because of his pain.  (AR 117).  He wrote that he is able to walk "no to [sic] far" from his home, to stand for ten to fifteen minutes at a time, and to sit for thirty to forty-five minutes at a time.  (AR 118).  Plaintiff finds himself "constantly" having to stop engaging in activities due to pain.  (Id.).

On November 19, 2007, Plaintiff also completed his "Function Report - Adult," (AR 119-26), on which he wrote that he was no longer able to "work, [play] sports, run, lift heavy objects, hold [his] food down or liquids" because of his injuries.  (AR 120).  He does not do yard work because he cannot stand for long or bend over because those actions cause dizziness.  (AR 122).  Plaintiff included watching television and playing sports with his children as his hobbies and interests.  (AR 123).  When answering how often and how well he performed these hobbies and interests, Plaintiff wrote "not as often, and not as well."  (Id.). Plaintiff's illness causes him to tire easily, in addition to causing dizziness, vomiting, and nausea.  (Id.).  He plays dominoes and cards two to three times a week and visits his mother, who lives on the same

7

street, everyday.  (AR 119, 123).   In the section asking what abilities were affected by the claimant's injury or condition, Plaintiff checked the boxes for lifting, bending, standing, kneeling, memory, and understanding.  (AR 124).

**C.   Plaintiff's Testimony**

After Plaintiff's initial application for DIB was denied, there was a hearing on February 23, 2010 where a medical expert, vocational expert, and Plaintiff testified.  (AR 24).   Plaintiff testified that he completed school through the eleventh grade, in addition to some course work at L.A. Trade Tech and Fremont Adult High School.  (AR 28). Plaintiff completed classes at both schools, but never finished a course to receive a certificate.  (AR 28-29).  Prior to his alleged onset date, Plaintiff worked for the United Parcel Service ("UPS") for sixteen years, primarily loading, unloading and sorting boxes.  (AR 29).

Plaintiff testified that his disability onset date was August 15, 2006, after which he stopped working because "[he] got home and [he] woke up and passed out, hit [his] head, and hit a pinched . . . nerve in [his] neck.  And [he] had a lot of bad headaches . . . And, [he] has a pancreas problem now."  (AR 29-30).   He said that his pancreas is swollen and that he "can't eat nothing, can't hardly stand, can't hardly walk too long, because [he] [throws] up a lot and [he] [has] a lot of diarrhea."  (AR 30).  He is only able to walk a half block, if that, due to his condition.  (AR 31).  He also needs to stop because he gets short of breath and dizzy.  (AR 31-32).  He cannot stand for long because his legs get tired, and he gets dizzy and weak.  (AR 32).   He throws up

everyday, with an average of "at least three times a day," and has diarrhea "maybe one time a day." (AR 31). Additionally, he said that he cannot sit for long, "like, maybe five or ten minutes" because his lower back and a nerve in his neck cause him pain. (AR 33). Prior to his injury he could lift things up to seventy-five pounds, but now he "can't lift no [sic] more than about twenty pounds. Not even twenty pounds, maybe." (AR 34).

Plaintiff testified to being hospitalized at St. Francis for his pancreas and stomach. (AR 38). St. Francis sent Plaintiff to Cedars-Sinai Medical Center, where the doctor told him that he had "swelling of the pancreas" and performed a biopsy, but never told him the results. (AR 38-39). He was also hospitalized at Kaiser after he "had a pinched nerve in [his] neck when [he] passed out." (AR 39). He also had problems with anxiety, which were mentioned during his hospitalizations at St. Francis and Kaiser. (<u>Id.</u>).

**D.   <u>Consultative Evaluations</u>**

Dr. N. Lin performed Plaintiff's internal medicine evaluation on April 11, 2008. (AR 284-288). He found that Plaintiff "is able to lift or carry 50 pounds occasionally and 25 pounds frequently. He can stand or walk up to 6 hours in an 8-hour workday and he can sit for 6 hours in an 8-hour workday. There are no postural, manipulative, visual or communicative limitations." (AR 288).

On May 17, 2008, Dr. Sohini P. Parikh performed a complete psychiatric evaluation and found that Plaintiff did not have "any

impairment in the ability to reason and make social, occupational, and personal adjustments." (AR 295). However, Dr. Parikh diagnosed Plaintiff with mood disorder and anxiety disorder. (AR 294-95).

**E.   Medical Expert's Testimony**

At the February 23, 2010 hearing, the medical expert, Dr. Nafoosi,[3] testified that the medical records supported findings that Plaintiff had a cervical spine disorder, degenerative joint disease and a mood disorder. (AR 41). However, he found that based on the record, Plaintiff's pancreatitis and radiculopathy of the lower back were not medically determinable. (AR 43). Dr. Nafoosi did not review the Cedar Sinai records to arrive at his conclusions, because they were not in the file he was provided with. (Id.). He also found Plaintiff's lower back pain complaints were possible, even though the pain was not medically determinable. (AR 41). Ultimately, Dr. Nafoosi testified that Plaintiff had a severe cervical spine condition. (AR 41-42).

**F.   Vocational Expert's Testimony**

At the February 23, 2010 hearing, the vocational expert ("VE"), Kelly Huynh, testified that Plaintiff's past work was the medium, unskilled work of a laborer. (AR 46). The VE testified that Plaintiff could not perform his past work, but that he could perform other work, such as a deliverer. (AR 47). The VE stated that for deliverers, which

---

[3] The February 23, 2010 transcript refers to the medical expert as Dr. Stanley Nafuzi, but the court reporter notes this spelling is phonetic, (AR 24), so the Court defers to the spelling provided in the ALJ's opinion. (AR 14).

10

assume a medium, unskilled position, there are 2,700 positions available locally and 310,000 nationally. (Id.). Additionally, the VE testified that Plaintiff could perform the work of a packager, an employment option with 18,000 positions locally and 480,000 positions nationally. (Id.). However, the VE also stated that if Plaintiff needed to take two to three breaks in addition to his normal breaks to use the bathroom, he could not do either job. (AR 47-48).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[4] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 404.1520(a). The steps are:

---

[4]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. § 404.1510.

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 404.1520(a)(4).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54; see also Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  If, at step four, the claimant meets his burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's

12

residual functional capacity ("RFC"),[5] age, education and work experience. <u>Tackett</u>, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 20). At the first step of the five-step evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 15, 2006. (AR 14). Next, at step two, he found that Plaintiff had a "severe impairment: disorder of the cervical spine." (<u>Id.</u>). At the third step, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 16).

---

[5] Residual functional capacity is "the most [one] can still do despite [his] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. § 416.945(a).

13

At step four, the ALJ found that Plaintiff has the RFC "to perform medium work as defined in 20 CFR 404.1567(c) except occasionally work at shoulder level with both upper extremities; and no work at unprotected heights, around heavy machinery or open pool of water." (AR 16). The ALJ thus found that Plaintiff was unable to perform his past relevant work, (AR 18), but that transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled. (AR 19). Plaintiff was defined as a younger individual because he was 41 years old on the alleged disability onset date. (Id.). Plaintiff has at least a high school education and is able to communicate in English. (Id.).

At the fifth step, the ALJ could not use the grids because Plaintiff was not able to perform substantially all of the requirements of "medium work." (AR 19). To determine the extent to which Plaintiff's additional limitations impeded on his ability to perform work, the ALJ consulted a vocational expert who testified that jobs existed in the national economy for someone with Plaintiff's age, education, work experience, and RFC. (AR 19-20). Relying on the vocational expert's testimony, the ALJ held that Plaintiff could perform other work, such as a deliverer or hand packager. (Id.). Thus, the ALJ found there were jobs in the economy that Plaintiff could perform and Plaintiff was found not disabled. (AR 20).

\\
\\
\\
\\
\\

14

# VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"'Substantial evidence' means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) (quoting Desrosiers v. Sec'y of Health & Human Servs, 846 F.2d 573, 576 (9th Cir. 1988)); see also Reddick, 157 F.3d at 720.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-21.

//

//

//

//

//

15

1

VII.

2

DISCUSSION

3

4      **The ALJ Failed To Provided Clear And Convincing Reasons For**

5      **Rejecting Plaintiff's Credibility**

6

7      Plaintiff contends the ALJ erroneously rejected his testimony by

8  relying on immaterial inconsistencies.  (Opening Brief in Support of

9  Plaintiff's Complaint ("Complaint Memo") at 10).  For the reasons stated

10  below, the Court finds the ALJ's decision should be reversed and this

11  action remanded for further proceedings.

12

13      The ALJ may reject a claimant's testimony if he or she makes an

14  explicit credibility finding that is supported by "specific, cogent

15  reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th

16  Cir. 1995) (citing Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir.

17  1990) (internal citations omitted)).  When determining whether to reject

18  a claimant's subjective pain and symptom testimony, the ALJ applies a

19  two-step analysis.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir.

20  2009).  First, the ALJ must determine whether there is "'objective

21  medical evidence of an underlying impairment which could reasonably be

22  expected to produce the pain or other symptoms alleged.'"  Id. (quoting

23  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Second,

24  if the ALJ finds evidence to support the alleged pain or other symptoms

25  and there is no evidence of malingering, then he or she must provide

26  "specific, clear and convincing reasons" for rejecting the claimant's

27  credibility.  Id.; see also Smolen, 80 F.3d at 1281.  The ALJ may use

28  "'ordinary techniques of credibility evaluation'" to assess the

claimant's testimony, such as considering inconsistencies within the claimant's testimony or between the testimony and claimant's conduct. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). The ALJ may also consider whether the claimant's daily activities are inconsistent with his or her alleged symptoms. Lingenfelter, 504 F.3d at 1040.  However, the ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence. Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991).

Here, the ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of [the] symptoms [we]re not credible to the extent they [we]re inconsistent with the . . . [RFC] assessment."  (AR 17). The ALJ rejected Plaintiff's testimony based on five areas where he was inconsistent: (1) highest level of education obtained, (2) inability to stand, (3) frequency of vomiting, (4) disability due to hypertension; and (5) inability to function due to vertigo and dizziness.  (AR 18).

First, the ALJ found that Plaintiff was inconsistent regarding the level of education he obtained.  (AR 18).  The ALJ found that Plaintiff's testimony was inconsistent because "[Plaintiff] stated that he completed 12th grade in his application.  However, at the hearing the [Plaintiff] testified he only completed 11th grade."  (Id.) (citations omitted).  At the hearing, Plaintiff testified that he only completed the eleventh grade.  (AR 28).  However, he also testified that although he never received his GED, "[he] went to college" and "tr[ied] to get

[his] grades from LA Trade Tech and [went] back to Freemont Adult High School." (Id.).  Consequently, Plaintiff's testimony appears to be a clarification of his previous report rather than a true inconsistency. Regardless, this inconsistency, if valid at all, is minor in light of all of Plaintiff's testimony and inconsequential to Plaintiff's testimony related to his medical condition.  Thus, this reason provided by the ALJ is not a legitimate reason to discredit Plaintiff's credibility.

Second, the ALJ found that Plaintiff made inconsistent statements about his ability to stand.  (AR 18).  The ALJ noted that "Plaintiff also stated he cannot stand for 'too long' due to his dizziness.  And yet, he visited his mother everyday by walking down the street and played sports with his kids." (Id.) (citations omitted).  Plaintiff did list playing sports with his children as one of his hobbies and interests in his function report.  (AR 123).  However, Plaintiff also wrote in his report that sports was something he was able to do before his disability that he can no longer do.  (AR 120).  In his pain questionnaire, Plaintiff also said he can no longer play basketball and football due to pain from his injuries.  (AR 117).  Plaintiff's statements in his functional report and his pain questionnaire support the conclusion that Plaintiff was formerly able to play sports with his children, but no longer is, not the conclusion that Plaintiff continues to play sports with his children.  Thus, the ALJ's determination that Plaintiff can still play sports is not supported by the record and not a sufficient reason to discredit Plaintiff's credibility.

The ALJ's determination that Plaintiff's alleged inability to stand for long periods conflicts with his ability to walk to his mother's house is also not supported by the record. (AR 18). Plaintiff stated that he can only stand for ten to fifteen minutes, (AR 118), and walk not too far from home, (id.), about half a block. (AR 31). Plaintiff lives at 1150 E. 107th Street, Los Angeles, CA 90002, (AR 64), while his mother lives only a few houses away at 1130 E. 107th Street, Los Angeles, CA 90002. (AR 118). His testimony about not being able to stand and bend to do yard work because it causes dizziness, (AR 122), does not conflict with his ability to walk to his mother's home a few houses down the street. Thus, this reason cited by the ALJ is not a legitimate reason to reject Plaintiff's credibility.

Third, the ALJ noted that "[a]t the hearing [Plaintiff] testified he vomits everyday. However, to Dr. Lin, the consultative examiner, [Plaintiff] reported only vomiting once a week." (AR 18) (citations omitted). Almost two years elapsed between Plaintiff's April 2008 statement to Dr. Lin (AR 284) and his statement at the hearing before the ALJ in February 2010. (AR 31). Because Plaintiff's statements as to how often he experienced vomiting symptoms were made at different times during his illness, the ALJ wrongly held against Plaintiff this inconsistency, if it is an inconsistency at all.

Moreover, the record confirms that Plaintiff suffered from episodic vomiting on numerous occasions. (AR 233, 247, 268-69, 271, 284). Plaintiff has also been diagnosed with chronic pancreatitis, which can produce symptoms such as nausea and vomiting. (AR 378, 392, 394, 407-08). As long as Plaintiff offers evidence of a medical impairment that

could be reasonably be expected to produce some degree of symptom, the ALJ may not require the degree of symptom to be corroborated by objective medical evidence. Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1995). The record is replete with objective medical evidence to support Plaintiff's diagnosis of chronic pancreatitis. (AR 378, 392, 394, 407-08). This evidence is sufficient to support Plaintiff's credibility as to his vomiting complaints.

Additionally, the ALJ found that "[Plaintiff's] weight has been essentially constant without any significant fluctuation as one might expect with frequent vomiting." (AR 18). However, the record contradicts the ALJ's determination that Plaintiff's weight did not fluctuate. For example, on October 4, 2007, Plaintiff weighed 211 lbs., (AR 271), nine pounds less than his December 2006 weight of 220 lbs. (AR 199). In addition, Plaintiff lost another thirteen pounds between October 4, 2007 and October 30, 2007, a short span of about three weeks. (AR 410). By October 30, 2007, Plaintiff had lost a total of twenty two pounds. (AR 199, 410). Moreover, Dr. Bhatt at St. Francis Medical Center ordered a CT scan of Plaintiff's abdomen and a gastric emptying study to determine the cause of Plaintiff's weight loss, which indicates that Dr. Bhatt was concerned about Plaintiff's drop in weight. (AR 279, 281). Additionally, in a disability report dated October 29, 2007, it was noted "Clmt looked very thin" which further contradicts the ALJ's assertion that plaintiff's weight did not fluctuate. (AR 103). Thus, the ALJ's determination that Plaintiff's weight remained "essentially constant" is incorrect in light of the evidence contained in the record, and is not a legitimate reason to discredit Plaintiff's testimony.

Fourth, the ALJ found that "[Plaintiff] also alleged disability due to hypertension. However the treating notes indicated his blood pressure was normal with 107/72 and 110/56 in September 2006." (AR 18) (citations omitted). The ALJ only cited Plaintiff's blood pressure on two occasions in September 2006 when his blood pressure was normal, (id.), while the record contains several treating notes that indicate Plaintiff's blood pressure was elevated including: 135/88 on August 18, 2006 (AR 226), 121/82 on August 23, 2006, (AR 148), 130/90 on August 24, 2006, (AR 160), 135/50 on September 5, 2006, (AR 210), 126/74 on October 4, 2007, (AR 271), 130/80 on October 16, 2007, (AR 234), 125/88 on October 18, 2007, (AR 244), 126/85 on October 30, 2007 (AR 410) and 121/81 on February 29, 2008. (AR 381). Thus, it is unclear, based upon this record, whether or not Plaintiff suffered from hypertension and the role hypertension may play in Plaintiff's symptoms.

Fifth, the ALJ determined that "[Plaintiff] alleges inability to function due to vertigo and dizziness. However the treating notes stated diagnosis was benign paroxsymal positional vertigo. A CT scan of the head showed no signs of intra-cranial masses. And the MRI of the brain revealed no significant abnormalities." (AR 18) (citations omitted). Plaintiff was diagnosed with "vertigo, benign paroxysmal positional" on September 21, 2006 after suffering from vertigo for several weeks. (AR 207, 209). Although the record does not explain what benign paroxysmal positional vertigo is, the record does support a general diagnosis of vertigo. For example, Plaintiff's discharge summary from the Bellflower Medical Center states "[t]he patient also had vertigo 'spinning' dizziness with movement of his head." (AR 146). Plaintiff was also diagnosed with "posttraumatic vestibular disorder

1 (Vertigo)" by Dr. Onubah during his neurological evaluation on April 4,

2 2008.  (AR 353).  Additionally, Dr. Lo at Cedar Sinai Medical Center

3 noted that Plaintiff "has had significant problems with vertigo" in his

4 treatment notes on October 30, 2007.  (AR 408).  Finally, Plaintiff

5 complained about dizziness during several of his medical visits,

6 including visits in August 2006, (AR 146, 167, 221, 226), October 2007,

7 (AR 233, 237, 246), April 2008 (AR 353), and July 2008.  (AR 325).

8 Thus, the basis for the ALJ's rejection of Plaintiff's claims about

9 vertigo and dizziness is undermined by the record.

10

11     In sum, the ALJ failed to provide specific clear and convincing

12 reasons for rejecting Plaintiff's credibility.  Thus, the decision must

13 be reversed.[6]   Upon remand, the ALJ must reconsider Plaintiff's

14 subjective pain testimony in light of the entire record and if his

15 testimony is rejected, he must provide clear and convincing reasons that

16 are consistent with the record.

17 \\

18 \\

19 \\

20 \\

21 \\

22 \\

23

24 _____

25     [6] The ALJ ultimately found that "[Plaintiff] ha[d] not been under
   a disability, as defined in the Social Security Act, from August 15,
26 2006, through the date of this decision [May 7, 2010]."  (AR 20)
   (citation omitted).  However, the Court notes that Plaintiff was
27 receiving DIB for his condition until November 21, 2007, when his
   benefits were terminated for exhaustion of funds.  (AR 94-99).  Thus,
28 the Agency apparently found Plaintiff's claims credible at least until
   November 21, 2007.  (AR 95).

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this matter for further proceedings consistent with this decision.   IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 23, 2012.


_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

23